<u>Affidavit for Warrant of Arrest in Rem</u>

1. I have been a federal law enforcement officer since November 2003 and has been employed as a Special Agent with Homeland Security Investigations (HSI) since January of 2008. My past and current duties include but are not limited to the investigation and enforcement of federal laws regarding drug trafficking, money laundering, smuggling, arms export violations, commercial fraud, and intellectual property violations. Your affiant was previously employed as a Supervisory Officer with U.S. Customs and Border Protection (CBP). As a CBP Supervisory Officer I was the supervisor of Anti-Terrorism Contraband Enforcement Team where my primary responsibilities were to detect and prevent contraband from entering into the United States, while facilitating the orderly flow of legitimate trade. This required enforcing laws related to revenue and trade, seizure of contraband and the interdiction of such contraband.

2. I have had specific training in Money Laundering and Asset Forfeiture Training and was assigned to the HSI Baltimore High Drug Trafficking Area HIDTA Drug Money Laundering Initiative (DMLI). While assigned to HIDTA DMLI I was assigned to the Frederick County Drug Task Force consisting of members from the Maryland State Police, Frederick County Sherriff's Office, Fredrick City Police Department and HSI

3. I am currently assigned to HSI Resident Agent in Charge Harrisburg / York which is responsible for but not limited to the investigations related to Title

19, Title 18 and Title 21 of the United States Code in and around the U.S. Customs territory, ports of entry and related areas contiguous to them. I have participated in several investigations that have focused on the transportation and distribution techniques used by persons involved in the trafficking of illicit drugs and their proceeds. I have been the affiant on several Title III Wiretaps related to the trafficking of illicit drugs and the laundering of illegal proceeds. I have been the affiant on numerous search and seizure warrants related to the trafficking of illicit drugs and the laundering of the illegal proceeds from the trafficking of illicit drugs.

4. Based on my training and experience and discussions with other HSI agents and other law enforcement officers, about their experiences and the results of their investigations and interviews, I am familiar with the methods utilized in illicit narcotics trafficking operations, as well as the methods and means used by Drug Trafficking Organizations (DTO) to control illicit narcotics trafficking. Specifically, I am familiar with the importation of illegal narcotics into the United States from Mexico and other foreign countries. I also know that once the illicit narcotics reach their final destination cities, they are distributed by wholesale dealers down to street level users often through mid-level distributors.

5. Additionally, I am aware that narcotics trafficking organizations must collect and transport drug proceeds from the sale of their illicit narcotics and often these drug proceeds are transported in the form of bulk currency. I am

also aware that laundering of bulk currency may involve the use of "funnel" accounts, bank accounts utilized by money launderers to structure bulk currency deposits below the $10,000 threshold that triggers the filing of a Currency Transaction Report (CTR).

6. The following is based on my own investigation, as well as information from other federal, state, and local narcotics agents and officers. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Dates and times are approximate.

## PROBABLE CAUSE

7. As an HSI Special Agent, your affiant's duties include the documentation, identification and the seizure of proceeds of drug trafficking. In addition, your affiant's duties include the tracing of illicit proceeds to determine whether these proceeds have been transacted to conceal or disguise the nature, location, source, ownership or control of the proceeds; or to promote the carrying on of unlawful activity; or to avoid a currency reporting requirement under State or Federal law; or to convert such proceeds into other assets. By virtue of the aforementioned experience, training and continuous contacts with other law enforcement personnel who specialize in financial investigations, your affiant knows the following

8. That persons involved in illegal activities such as large-scale narcotics trafficking, gambling, prostitution and various forms of theft (hereinafter

referred to as "criminals") often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection and seizure of these assets by government agencies.

9. That even though these assets are in names other than the criminals, the criminals usually own and continue to use these assets, and/or exercise dominion and control over them.

10. That criminals must maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing illegal business. That it is common for large-scale narcotic traffickers to maintain books, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers etc, are maintained where the traffickers have ready access to them.

11. That it is common for large-scale narcotic traffickers to secrete contraband, proceeds of narcotics sales, .and records of drug transactions in secure locations within their residences, their businesses, the residences of relatives and associates, safe deposit boxes, and/or other locations which they maintain dominion and control for their ready access, and to conceal these items from law enforcement authorities.

12. That, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences, within their

businesses, at the residences of relatives and associates, safe deposit boxes, and/or other locations (including buried on the grounds of the places described therein.) That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the aforementioned locations of narcotics traffickers.

13. That it is common for persons involved in criminal activity to maintain evidence relating to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as; large amounts of currency, financial instruments, precious metal and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, Certificates of Deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money, wrappers, and other evidence of financial transactions. These items are maintained by the narcotics traffickers within their residences, their businesses, the residence of relatives and associates, safe deposit boxes, and/or other locations, which they maintain dominion and control over.

14. That the sale of controlled substances generates large quantities of U.S. currency in small denominations (commonly referred to.as "street money").

15. That it is common for narcotics traffickers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying

$1,000.00 increments to facilitate quick counting.

16. That the Courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed, may establish probable cause that the questionable currency originated from narcotics transactions.

17. That it is common for narcotics traffickers to exchange "street money" (small denominations) for large denominations of currency, which can be concealed in secure locations within their residences, their businesses, the residences of relatives and associates, safe deposit boxes, and/or other locations in order to amass a larger amount of currency in a concealed area.

18. That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000.00, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution.

19. That in order to evade the filing of a CTR, narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000.00, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency; or they have someone conduct their currency transaction on their behalf.

20. On November 17, 2020, Pennsylvania State Police ("PSP") Trooper Long conducted a routine traffic stop on Interstate 81 southbound in Lebanon

County, Pennsylvania for moving violations. The vehicle was operated by Dalal Alajeel. Albert Rodriguez Jr. was a passenger in the vehicle at the time. Both occupants appeared visibly nervous when speaking with Trooper Long and they presented with shaking hands and heavy breathing.

21. After a brief discussion with Alajeel and Rodriguez, Trooper Long discovered that the vehicle had been rented by Rodriguez in New York. Although Alajeel presented a Kuwaiti passport and ID card to Trooper Long, she possessed no discernible vehicle operator's license.

22. Trooper Long explained to Alajeel and Rodriguez that, in light of the fact that he was unable to read the writing on the documents provided by Alajeel, he would be issuing a written warning to Rodriguez, despite the fact that he had not been operating the vehicle at the time of the stop. Trooper Long requested that Rodriguez accompany him to his vehicle while he prepared the warning.

23. As Trooper Long prepared the warning, he engaged in conversation with Rodriguez concerning he and Alajeel's travel plans. Rodriguez explained that he had rented the vehicle to travel to Los Angeles, and that he and Alajeel intended to stop in Ohio to visit his family. During their conversation, Trooper Long observed Rodriguez creating distance between himself and his vehicle.

24. As Trooper Long continued to question Rodriguez, Rodriguez became increasingly confused and ultimately stated that they were not stopping in Ohio and suggested he knew nothing about Ohio. Rodriguez explained that they were on their way to Los Angeles to visit a friend. Rodriguez appeared

visibly uncomfortable and nervous, dropping his head and licking his lips.

25. Upon returning to the rental vehicle, Trooper Long engaged Alajeel in conversation and she explained that she didn't know anything about their planned road trip, and suggested it was a surprise for her.

26. As Trooper Long continued preparing the written warning, he requested permission from Rodriguez to search the vehicle, which was denied. Rodriguez denied having any weapons or contraband items in the vehicle but stated that there was cash in the vehicle, although nothing over $10,000. Trooper Long then requested a K9 unit and subsequently conducted an exterior search of the vehicle.

27. During the K9 search of the exterior of the vehicle, the canine exhibited several alert behaviors, prompting Trooper Long to conduct a hand search of the interior of the vehicle. During the search of the vehicle, he discovered a black duffle bag which held three Ziplock bags containing large amounts of U.S. currency, two fully loaded tasers with extra cartridges, as well as a pair of brass knuckles. Additionally, Trooper Long discovered a black backpack containing a large amount of U.S. currency.

28. Following the search of the interior of the vehicle, Rodriguez was cited for possession of prohibited weapons, and the taser, brass knuckles and currency totaling $345,950 were logged into evidence at the PSP barracks in Jonestown, Pennsylvania.

29. On November 24, 2020, an ion scan was conducted on the seized currency,

which alerted to the high presence of narcotics, specifically cocaine at 37%.

## WARRANT OF ARREST IN REM REQUESTED

30. Based on the foregoing evidence including the following specific evidence, your affiant believes that there is probable cause to seize $345,950.00 in U.S. Currency, from Albert Rodriguez Jr. and Dalal Aljeel, now being held by the Pennsylvania State Police.

31. Your affiant therefore request the issuance of a Warrant of Arrest in REM to Seize $345,950.00 in U.S. Currency in accordance with Title 18, USC § 981(a)(l)(A) and Title 18, USC, § 981(a)(l)(C).

                                                Respectfully submitted,

                                                Robert Mayer
                                                Special Agent
                                                Homeland Security Investigations